### RECORD NO. 11-5081

In The

# United States Court Of Appeals

### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## ROBERTO TEXIDORE,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE**

_____

**REPLY BRIEF OF APPELLANT**
_____

**Henderson Hill,** Executive Director
FEDERAL DEFENDERS OF
  WESTERN NORTH CAROLINA, INC.

**\*Ann L. Hester**
**Assistant Federal Defender**
**129 West Trade Street**
**Suite 300**
**Charlotte, NC  28202**
**(704) 374-0720**

*Counsel for Appellant*
*\*Counsel of Record*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

    I.    The government fails to confront the fact that the district court declined to engage in comparative juror analysis .................................2

    II.    The government fails to justify its closing statement, which violated Texidore's Fifth Amendment rights by suggesting that the jury should infer Texidore's guilt because of his failure to present DNA evidence ........................................................................7

        A.    The government's argument was improper .................................7

        B.    The government must show harmlessness beyond a reasonable doubt ........................................................................ 13

        C.    Under either harmless-error standard, the government's improper closing argument requires reversal...........................16

            1.    The government's improper closing argument was not harmless beyond a reasonable doubt ........................17

            2.    The Scheetz Factors Also Weigh Strongly In Favor Of Reversal ..................................................................19

CONCLUSION ...................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*Akwal v. Mitchell*,
  613 F.3d 629 (6th Cir. 2010) (en banc), *cert. denied*,
  131 S. Ct. 1002 (2011)....................................................................20

*Batson v. Kentucky*,
  476 U.S. 79 (1986)...........................................................2, 3, 6, 7

*Chapman v. California*,
  386 U.S. 18 (1967)....................................................................1, 16

*Miller-El v. Dretke*,
  545 U.S. 231 (2005)...............................................................1, 3, 4, 5

*Snyder v. Louisiana*,
  552 U.S. 472 (2008)....................................................................4, 6

*Thaler v. Haynes*,
  130 S. Ct. 1171 (2010)....................................................................5

*United States v. Barnette*,
  644 F.3d 192 (4th Cir. 2011), *cert. denied*,
  132 S. Ct. 1740 (2012)..............................................................*passim*

*United States v. Battle*,
  370 F. App'x 426, 429 (4th Cir.), *cert. denied*,
  131 S. Ct. 341(2010)....................................................................9

*United States v. Caro*,
  597 F.3d 608 (4th Cir. 2010), *cert. denied*,
  132 S. Ct. 996 (2012)............................................................. 15-16

*United States v. Carroll*,
  678 F.2d 1208 (4th Cir. 1982) ....................................................18

*United States v. Chorman*,
    910 F.2d 102 (4th Cir. 1990) .......................................................................14

*United States v. Collins*,
    415 F.3d 304 (4th Cir. 2005) ..................................................................14, 16

*United States v. Diaz-Diaz*,
    433 F.3d 128 (1st Cir. 2005)...................................................................12, 13

*United States v. Eddington*,
    416 F. App'x 258 (4th Cir. 2011) ................................................................16

*United States v. Harrison*,
    716 F.2d 1050 (4th Cir. 1983) .....................................................................15

*United States v. Hasting*,
    461 U.S. 499 (1983)........................................................................13, 14, 16

*United States v. Ibisevic*,
    675 F.3d 342 (4th Cir. 2012) ................................................................18, 21

*United States v. Martin*,
    756 F.2d 323 (4th Cir. 1985) .......................................................................12

*United States v. Mitchell*,
    1 F.3d 235 (4th Cir. 1993) ...........................................................................22

*United States v. Palmer*,
    37 F.3d 1080 (5th Cir. 1994) ...................................................................9, 11

*United States v. Scheetz*,
    293 F.3d 175 (4th Cir. 2002) ...............................................................*passim*

*United States v. Stockton*,
    349 F.3d 755 (4th Cir. 2003) .........................................................................9

*United States v. Varner*,
    748 F.2d 925 (4th Cir. 1984) .......................................................................19

*United States v. Wilson*,
    135 F.3d 291 (4th Cir. 1998) .......................................................................15

*United States v. Wilson*,
    624 F.3d 640 (4th Cir. 2010), *cert. denied*,
    132 S. Ct. 451 (2011)........................................................................16

*United States v. Wimbley*,
    553 F.3d 455 (6th Cir. 2009) .................................................10, 11

**CONSTITUTIONAL PROVISION:**

U.S. CONST. AMEND. V ....................................................................1, 7, 13

**OTHER:**

Charlotte Mecklenburg Police Department,
Submitting Impounded Property Directive, section 700,
available at http://charmeck.org/city/charlotte/CMPD/
resources/DepartmentDirectives/Documents/CMPDDirectives.pdf ................... 9-10

Thomas A. Mauet, *Trial Techniques*
    114 (7th ed. 2007)...........................................................................20

## **INTRODUCTION**

Roberto Texidore's trial suffered from two major errors which the government fails to justify. First, during jury selection, the district court refused to engage in any meaningful comparison of the minority prospective jurors whom the government struck from the panel and the non-minority prospective jurors who served on the jury. The government's argument that by describing the two struck jurors as "particularly inattentive," the district court discharged its duty to "engage in a *carefully calibrated* comparative juror analysis," is contrary to Supreme Court and Fourth Circuit precedent. *United States v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011) (emphasis added), *cert. denied*, 132 S. Ct. 1740 (2012); *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

In addition, the government's closing argument, which suggested the jury should infer Texidore's guilt from his failure to present DNA evidence, was prejudicial error requiring reversal. Because Texidore raised a Fifth Amendment challenge to this argument, the government must show that the error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24 (1967). It fails to discharge this burden. Moreover, even under the factors set forth in *United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002), the government's argument was improper and highly prejudicial. For these reasons, Texidore's conviction should be reversed.

## ARGUMENT

**I.    The government fails to confront the fact that the district court declined to engage in comparative juror analysis.**

The framework for establishing a case of discrimination in jury selection is well established. *See Batson v. Kentucky*, 476 U.S. 79, 93-98 (1986). The government and the defense agree that first a defendant must make a prima facie case of discrimination; if he is successful, the government must provide a nondiscriminatory reason for the strike; and, finally, the district court must determine if the defendant established purposeful discrimination by looking at all of the evidence. Op. Br. 13-14; U.S. Br. 14. Once the government articulates a reason for exercising peremptory challenges, as it did in this case, this Court will not address whether a prima facie showing has been made. Op. Br. 13-14; U.S. Br. 13-14.

The government also agrees that the district court is required to conduct a comparative juror analysis in the final step of the *Batson* analysis. U.S. Br. 15. This Court has left no doubt that, in order to determine whether the defendant has shown purposeful discrimination, a district court is "*required* to . . . engage in a *carefully calibrated* comparative juror analysis." *Barnette*, 644 F.3d 205 (emphasis added). Comparative juror analysis necessitates a "side-by-side comparison[]" of jurors who were peremptorily struck with those who were not because "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to

2

prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El*, 545 U.S. at 241.

Although the parties agree on the analytical framework to be applied, the defense and government diverge on whether the district court engaged in comparative juror analysis at all, much less a "carefully calibrated" side-by-side comparison of jurors. At the third step of the *Batson* analysis, the district court did not conduct a comparative juror analysis. The government's stated race-neutral reason for striking the two female minority prospective jurors was their demeanor and apparent disinterest in the proceedings. JA 152. The court agreed that the women seemed unresponsive unless directly addressed. JA 152. But the defense responded that two non-minority women whom the government had not struck were similarly unresponsive. JA 153.

In response to this defense request that the court compare the struck jurors to specific jurors remaining on the panel, the court concluded: "the government only has to have a neutral reason. *It doesn't have to apply it in every case*. The court did observe Ms. Boulware and Ms. Shan both being particularly non-attentive." JA 153 (emphasis added). The district court's statement contradicts Supreme Court precedent as well as *Barnette*, where this Court noted that a court must look at the "similarities as well as . . . differences" between struck minority and retained non-minority jurors and that if the similarities are "strong," then "the prosecutors'

explanations for the strikes [can] not be accepted." 644 F.3d at 205. Of course, the government does not have to present the same reason for each strike. But equally as clear, using the justification of inattentiveness to strike minority jurors, while not applying it to strike non-minority jurors who also exhibit inattentiveness, is evidence of discrimination. *See Miller-El*, 545 U.S. at 241; *Barnette*, 644 F.3d at 205. Contrary to the district court's statement, a nondiscriminatory jury selection in fact *does* require that the government apply its asserted reasons for strikes equally to each prospective juror. Under *Miller-El* and *Barnette*, failure to do so is evidence of purposeful discrimination, and the court must consider it. *Id*.

The government asserts that the district court engaged in comparative juror analysis by uttering *two words* when it described Boulware and Shan as "particularly non-attentive." U.S. Br. 17-18. The government contends that this statement *implied* that the court was comparing the struck jurors to Jurors 6 and 12, whom defense counsel had identified as being similarly inattentive, despite the fact that the court had just stated its belief that the government was not required to apply its non-discriminatory reasons to every juror. U.S. Br. 18. To the contrary, it is not possible to compare prospective jurors by "impli[cation]." When a prosecutor's explanation for a peremptory challenge "invoke[s] a juror's demeanor," the trial judge's "first hand observations" are of great importance. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). But first-hand observations require a district court both to articulate how the

4

struck jurors differed from those allowed to serve and to identify which retained jurors formed the basis for the court's comparison. In this case, the district court did neither.

The court did not explain what made Boulware and Shan "particularly non-attentive" in light of the defense's argument that they were, in fact, similarly situated to Jurors 6 and 12, two Caucasian jurors. It made no findings regarding the mannerisms or attentiveness of Jurors 6 and 12. The court did not even make a finding as to whether Jurors 6 and 12 were unresponsive to questioning at all. JA 153. In addition, the court did not engage in a comparison, because it did not identify the jurors against whom it was assessing Boulware's and Shan's demeanor. Without an articulated benchmark from which to review the struck jurors, there can be no "side-by-side comparison[]." *Miller-El*, 545 U.S. at 241. The district court cannot engage in comparative juror analysis without describing and considering the specific characteristics of the selected jurors in order to compare them to the jurors whom the government struck.[1]

---

[1] The Supreme Court's recent decision in *Thaler v. Haynes*, 130 S. Ct. 1171, 1174-75 (2010), does not counsel a different result. In *Thaler*, a case on habeas review, the Supreme Court concluded that it had not previously established a categorical rule that a district court was barred from accepting a prosecutor's stated reason for a strike if it did not have a "personal recollection of the juror's demeanor." *Id.* at 1175. Here, by contrast, there was no indication that the district court did not remember the demeanor of the Caucasian jurors. Nonetheless, the court declined to engage in comparative juror analysis.

Examining cases in which the Supreme Court and this Court have reviewed comparative juror analysis demonstrates that the district court's analysis, if any analysis occurred at all, was inadequate. In *Snyder v. Louisiana*, the Supreme Court provided an example of what comparative juror analysis entails. 552 U.S. 472, 483-84 (2008). There, the Court analyzed at length the similarities between the struck minority juror and two white men who were allowed to remain on the jury. *Id*. It noted that at least one of the neutral reasons that the government gave—the juror's hesitation about the time commitment involved in the trial— was pretextual, because the two white jurors left on the jury had more pressing obligations. *Id*. In detail, the Court reviewed the time commitments that each of the prospective jurors had discussed. *Id*.

This Court, too, has underscored that a *Batson* challenge requires an in-depth comparison of jurors. In *Barnette*, the Court reviewed at length the district court's assessment of the government's stated reasons for striking prospective minority jurors and its detailed review of the similarities and differences between the answers that struck and retained jurors gave regarding the death penalty. 644 F.3d 192, 200-02 (4th Cir. 2011). This Court then independently engaged in comparative juror analysis and compared each of the struck juror's responses to questions with those of the retained jurors whom the defense argued provided similar answers. *Id*. at 215-217.

*Snyder* and *Barnette* establish the level of inquiry necessary to conduct comparative juror analysis at the third stage of a *Batson* claim. Contrary to the government's argument, the district court's comment that Shan and Boulware were "particularly non-attentive," immediately after its statement that the government "doesn't have to apply [the neutral reason] in every case," did not satisfy the court's duty to carefully review and compare these minority women to Jurors 6 and 12. The district court did not consider any of the specific characteristics of Jurors 6 and 12. The district court was "bound to consider [Texidore's] comparative juror analysis claim on the merits," and it failed to do so. *Barnette*, 644 F.3d at 216. Accordingly, this Court should vacate Texidore's conviction.

**II.  The government fails to justify its closing statement, which violated Texidore's Fifth Amendment rights by suggesting that the jury should infer Texidore's guilt because of his failure to present DNA evidence.**

**A.  The government's argument was improper.**

The government contends that its closing argument about Texidore's access to the gun and his ability to perform DNA testing was proper because it was "nothing more than the inverse of Defendant's arguments." U.S. Br. 22. But this mischaracterizes both the defense argument and the government's argument.

7

The defense argued:

> The fact of the matter is the gun in this case was swabbed. It was swabbed back when this case came in. There's no evidence before you that the government didn't have enough time to submit it. What you know is they just didn't. They never bothered. And you can bet that if they are going to get something useful from [it], they would have done it.

JA 436. This argument follows directly from the government's own witness, who testified that in her experience, usable DNA is retrieved from firearms in only approximately five percent of cases. JA 324. This argument by the defense did not suggest, as the government claims, that the firearm was not tested because it would have provided exculpatory evidence; rather the argument suggests that the government knew that the firearm would yield nothing "useful," or no evidence at all. JA 436. It was part of Texidore's overall argument that the government had the burden of proving Texidore's guilt beyond a reasonable doubt and that any unanswered questions had to be resolved in the defense's favor. JA 438-39.

In response, the government went far beyond refuting the defense argument. It argued that Texidore had equal access to the evidence, could have had the handgun tested for DNA evidence, and did not test for DNA because he was "afraid" of what the test would reveal. JA 445. This argument goes much further than suggesting that a DNA test would be useless and instead argues that the defense made a deliberate choice not to test the gun for DNA because the results would have incriminated Texidore. Furthermore, it contradicts the testimony of the

8

government witness who testified that DNA tests on firearms rarely provide usable evidence. JA 324. The government's suggestion to the jury that Texidore had an obligation to present exculpatory evidence and refrained from testing the gun for DNA because it was "afraid" of the result was not a valid response to the defense argument and was unconstitutional.

In addition, the government's closing argument was improper because it depends on a fact not in evidence: that the defense had equal access to the evidence and could have had it tested. *See, e.g., United States v. Stockton*, 349 F.3d 755, 763 n.3 (4th Cir. 2003) (any mention in closing argument of evidence not in the record would be "an inappropriate attempt by the prosecution to inject into the case evidence not before the jury"); *United States v. Palmer*, 37 F.3d 1080, 1086-87 (5th Cir. 1994) (prosecutor's comment on evidence outside the record, even if provoked, was impermissible). There was no evidence that the defense had access to the firearm or the swab for DNA testing. JA 448-49. Any evidence seized by the police, as were the handgun found in the car Texidore was driving and the DNA swab, remains in police custody. *See generally*, *United States v. Battle*, 370 F. App'x 426, 429 (4th Cir.), *cert. denied*, 131 S. Ct. 341(2010) (noting that an inventory search of a vehicle is necessary to identify and *secure* property inside); Charlotte Mecklenburg Police Department, Submitting Impounded Property Directive, section 700, available at http://charmeck.org/city/charlotte/CMPD/

9

resources/DepartmentDirectives/Documents/CMPDDirectives.pdf (noting that all
property taken or seized by a police officer "will be turned into the Property and
Evidence Management Division for storage . . .").

In defending the propriety of its closing argument, the government primarily
relies on *United States v. Wimbley*, where the defense attorney argued that the
government's failure to have drug bags tested for either DNA or fingerprints
constituted a "fatal flaw" in the government's proof and that he was "offended"
that officers would suggest such testing was unnecessary. *See* U.S. Br. 22;
*Wimbley*, 553 F.3d 455, 459 (6th Cir. 2009). Unlike the defense argument in
*Wimbley*, in Texidore's case, the defense did not argue that the lack of DNA
evidence was a fatal flaw, that the government had not performed proper testing, or
that the government had engaged in any misconduct. Instead, defense counsel
argued that if DNA testing had been likely to result in evidence of Texidore's guilt,
the government would have performed the testing. This was in conformity with the
government's own evidence from ATF Agent Sheri Hamlin that in her experience
usable DNA was found on firearms in fewer than five out of a hundred cases. JA
324. It also was consistent with the government's stipulation that the firearm was
swabbed for DNA and that it was not submitted for DNA analysis. JA 319. And it
was consistent with the defense's overall argument that the jury should not "look to
us if there are questions that are unanswered." JA 438.

Furthermore, the prosecutor's closing argument in Texidore's case went well beyond the government's defense of its failure to test for DNA in closing arguments in *Wimbley*. In *Wimbley*, the prosecutor argued that the defendant could have had the evidence tested for DNA and that: "If it was such a big deal to him, why didn't he have it tested, if he thought it would help him? But no, he just wants to complain because we didn't go and do these things that we don't think are necessary to prove the guilt of Russell Wimbley." 553 F.3d at 459. This statement suggests only that the government did not think that a DNA test would be useful. But unlike *Wimbley*, in closing at Texidore's trial, the government urged the jury to infer guilt from Texidore's failure to present DNA evidence. The prosecutor argued: "You have to ask yourself why the defense didn't get it tested. Ask yourself that question. I can't answer that for you. Ask yourself. What were they afraid to find?" JA 445. *Wimbley* is inapplicable here.

Like *Wimbley*, the other two cases cited by the government in an attempt to justify the government's closing argument are readily distinguishable. In *United States v. Palmer*, before closing argument began, the district court ruled that if the defendant argued to the jury that the government did not subpoena certain witnesses, the government would be allowed to respond by saying that the defense did not subpoena them. 37 F.3d at 1086. Defense counsel expressly agreed to that procedure. *Id.* Defense counsel then argued that the government did not subpoena

11

certain witnesses, and the prosecutor responded in a manner consistent with the

court's instruction and the defense's agreement. In contrast, Texidore's defense

counsel never made a similar agreement and, in fact, objected when the

government argued that Texidore had access to the evidence and did not have the

gun tested for DNA because he was afraid the results would incriminate him.

In *United States v. Martin*, the prosecutor argued "Where are the crab pots?"

in response both to a defense argument that the defendant was involved in a

commercial crabbing operation, not drug distribution, and to defense evidence that

a commercial crabber would need at least 20 crab pots and that the defendant had

purchased only four or five crab pots. 756 F.2d 323, 328 (4th Cir. 1985). The

government's argument, therefore, was a comment on evidence that the defense

*did* present. In contrast, the government's argument in Texidore's trial improperly

asked the jury to infer guilt based on DNA evidence that Texidore did *not* present.

Despite the government's protestations to the contrary, U.S. Br. 25, the

government's closing argument in this case is more similar to *United States v.

Diaz-Diaz*, 433 F.3d 128 (1st Cir. 2005), than it is to the cases the government

cites. In *Diaz-Diaz*, as in defense counsel's argument at Texidore's trial, the

defendant's closing argument "was not aimed at having the jury draw the inference

that the government did not" present evidence because it would have been harmful.

*Id.* at 135. "Instead, the argument was that the government had failed to present all

12

of the evidence needed to prove [Texidore] guilty beyond a reasonable doubt." *Id.*
The First Circuit held that, in this context, the prosecutor's comments that the
defendant could have called the witness whose absence the defense pointed out
"could have the effect of shifting the burden of proof, rather than refuting a
requested inference and, therefore, were improper." *Id.* The prosecutor's comments
at Texidore's trial were even worse. He suggested that the jury infer guilt from
Texidore's failure to test for DNA evidence by arguing "what were they afraid to
find?" And, unlike *Diaz-Diaz*, here the district court overruled defense counsel's
objections and refused to give a curative instruction.

The prosecutor's closing argument was improper, both because it
commented on Texidore's failure to present evidence in his defense and because it
was based on evidence not presented at trial.

**B.    The government must show harmlessness beyond a reasonable
doubt.**

As the government acknowledges, because a defendant has the right to remain
silent and the government bears the burden of establishing each element of the
charged offense, it is a violation of the Fifth Amendment for a "prosecutor to present
a closing argument that improperly shifts the burden of proof to the defendant or to
suggest that the defendant's failure to present evidence should be held against him."
U.S. Br. 19. Nevertheless, the government asserts that the constitutional harmless-
error standard applied by the Supreme Court in *United States v. Hasting*, 461 U.S.

13

499 (1983), does not apply here because it is "the more general standard" and because "[t]his Court's subsequent decisions, including *Collins*, make clear, however, that appellate review of this type of error warrants consideration of the four factors articulated in *Scheetz*." U.S. Br. 20 n.1. But the government fails to explain how this Court's decisions could overrule Supreme Court precedent.

In *Hasting*, the Court specifically held that, in reviewing a prosecutor's improper comment on the defendant's failure to present evidence, "[t]he question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" 461 U.S. at 510-11. The government contends that even though the defense has asserted the same constitutional error it raised in *Hasting*—that the government's closing argument improperly suggested that the jury should infer Texidore's guilt based on his failure to present evidence—the appropriate harmless-error review is not the constitutional standard but the one that this Court applies to improper closing argument generally. U.S. Br. 20 n.1.

In reviewing closing arguments generally, this Court considers, first, whether the argument was improper, and if so, whether it affected the defendant's substantial rights so as to deprive him of a fair trial. *United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990). In order to determine whether the defendant's

14

substantial rights have been infringed, this Court reviews six factors: "(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury." *Scheetz*, 293 F.3d at 186.

But the Court did not adopt this six-factor test in the context of a claimed constitutional error. *See United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983) (adopting the first four factors of the test in a case where the prosecutor impermissibly argued that the defense "grossly misrepresented" the law of conspiracy and that he "hated" the defendants but where the defense did not claim constitutional error); *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998) (adding the last two factors to the analysis in a case where the government improperly argued that the defendant was guilty of a murder for which he was not on trial, and the defense challenged the argument as outside the scope of the presented evidence, but not on constitutional grounds). Texidore recognizes that this Court has since applied the *Scheetz* factors in cases where the defendant has alleged that improper argument amounted to a due process violation. *See United*

15

*States v. Caro*, 597 F.3d 608, 625-27 (4th Cir. 2010) (argument that defendant could not be controlled in prison), *cert. denied*, 132 S. Ct. 996 (2012); *United States v. Wilson*, 624 F.3d 640, 656-57 (4th Cir. 2010) (arguing defendant's actions after murder showed aiding and abetting), *cert. denied*, 132 S. Ct. 451 (2011); *United States v. Collins*, 415 F.3d 304, 309 (4th Cir. 2005) (improper vouching); *United States v. Eddington*, 416 F. App'x 258 (4th Cir. 2011) (argument that defendant could have called a witness). However, none of those cases involve a prosecutor's closing argument, as this case does and *Hasting* did, that specifically asked the jury to infer guilt based on the defendant's failure to present evidence. And furthermore, none of these cases suggest that the defendant argued, as Texidore does now, that applying the *Scheetz* factors to determine prejudice is inconsistent with the constitutional harmless-error test established in *Chapman v. California* and applied in *Hasting*.

The *Scheetz* test for determining prejudice is inconsistent with the constitutional harmless-error test required by *Hasting*. *Hasting* prohibits applying *Scheetz* in this case, where the prosecutor made an unconstitutional comment urging the jury to infer guilt from the defendant's failure to present evidence.

**C.    Under either harmless-error standard, the government's improper closing argument requires reversal.**

Under either the *Chapman* harmless-error test or the *Scheetz* six-factor test, the government's closing argument in this case is reversible error.

16

1.    *The government's improper closing argument was not harmless beyond a reasonable doubt.*

First, the government's comments were not harmless beyond a reasonable doubt for a number of reasons. A review of the unconstitutional argument, the evidence presented at trial, and the length of the jury's deliberation in comparison to the complexity of the case shows that the jury had difficulty reaching a verdict. The closing argument may well have tipped its decision toward conviction. Under these circumstances, it is impossible for the government to demonstrate beyond a reasonable doubt that the jury would have returned a verdict of guilty absent the prosecutor's improper comments.

The government's argument likely swayed the jury for three reasons. First, the government made these comments at the end of its rebuttal argument, almost immediately before deliberations began, so it was fresh in the jury's mind. JA 444. The effect of this timing was compounded by the fact that the court had given its substantive jury instructions before the parties made closing arguments. JA 444-451.

Second, the evidence was not overwhelming. The testimony at trial established that the car did not belong to Texidore, contained numerous items belonging to its previous owner, and had been parked for over six months with a window open in a "not . . . good" neighborhood. JA 314-15, 405. Also, during the traffic stop, Officer Kluttz saw Texidore's fist clenched but never saw a gun in his hand. JA 34. In addition, the defense presented evidence demonstrating that it

17

would have been very difficult for Officer Klutz to see through Texidore's back window at night. JA 396.

One way to determine whether the jury considered the case a close one is to consider whether it deliberated for an extended period of time. *United States v. Ibisevic*, 675 F.3d 342, 354 (4th Cir. 2012) (noting that the jury's four-hour deliberation in a single-issue case established that the case was close). This was a single-issue case; the only question was whether Texidore possessed the gun. JA 466, 473. The trial evidence consisted of the testimony of five witnesses and was presented in less than four hours. JA 225, 328, 363, 451. Nevertheless, even with the prosecutor's impermissible closing argument, the jury deliberated for approximately five hours over two days—longer than it took to present the evidence. JA 451, 459, 461, 465. The duration of the jury's deliberations establishes that the evidence of guilt was far from overwhelming.

Third, and perhaps most damaging, the district court overruled the defense objection to the government's argument and refused the defense's request for a limiting instruction reminding the jury that the government bore the burden of proving guilt beyond reasonable doubt. JA 450. Allowing improper remarks to pass uncorrected implies that they are unobjectionable. *United States v. Carroll*, 678 F.2d 1208, 1210 (4th Cir. 1982). Accordingly, the government cannot establish beyond a reasonable doubt that the error did not affect the verdict.

18

2.      *The* Scheetz *Factors Also Weigh Strongly In Favor Of Reversal*

Even if the government's closing argument should be reviewed under the six factors enumerated in *Scheetz* instead of the constitutional harmless-error standard, reversal is warranted.

First, with respect to "the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant," *Scheetz*, 293 F.3d at 186, the prosecution's improper argument had a strong tendency to mislead the jury. It was the last argument, other than a brief summation, that the government made to the jury before its deliberations. JA 444-45. Although the government reminded the jury before making the improper argument that it bore the burden of proof, this did not mitigate the error. U.S. Br. 26-27. This merely provided the jury with conflicting arguments from the government that the government bore the burden to prove guilt and that the jury should infer guilt from Texidore's failure to present evidence of DNA testing. When a court gives conflicting instructions to the jury, the jury is presumed to have followed the incorrect instruction. *United States v. Varner*, 748 F.2d 925, 927 (4th Cir. 1984). The same should hold true here, where the prosecutor gave conflicting arguments, and one of them was improper.

Second, with respect to "whether the remarks were isolated or extensive," *Scheetz*, 293 F.3d at 186, contrary to the government's argument, the prosecutor's improper remarks were not isolated. The prosecution told the jury twice that the

19

defense had equal access to the evidence, and it asked the jury three times why the defense did not get the evidence tested and what the defense was afraid to find. JA 444-45. The trial was very short, all evidence was presented in under four hours, and this argument was the last the jury heard from the government. Furthermore, "jurors are thought to remember best what they hear first and last." *Akwal v. Mitchell*, 613 F.3d 629, 642 (6th Cir. 2010) (en banc) (citing Thomas A. Mauet, *Trial Techniques* 114 (7th ed. 2007)), *cert. denied*, 131 S. Ct. 1002 (2011). Consequently, the government's focus on Texidore's failure to test the DNA evidence at the very end of its closing argument was a memorable part of the proceedings.

Third, with respect to "the strength of competent proof introduced to establish the guilt of the defendant," *Scheetz*, 293 F.3d at 186, as discussed above, the evidence supporting Texidore's guilt was not overwhelming. Kluttz testified that he saw Texidore's clenched fist reach into the passenger seat back pocket, but he never saw what, if anything, Texidore was holding. JA 34. The car did not belong to Texidore, who had only driven it a few times; it was cluttered with debris from a previous owner; and it had been parked in a crime-ridden neighborhood with a window rolled down for over six months. JA 309-10, 312-16, 408. All of these facts raised doubt as to whether Texidore ever possessed the gun found in the pocket behind the passenger seat. This doubt was reflected in the fact that the jury

20

spent more time deliberating than it spent hearing the evidence at trial. Because the evidence was not strong enough for the jury to come to a conclusion quickly, it must have considered the evidence far from clear-cut. *Ibisevic*, 675 F.3d at 354. Therefore, the government's argument that the evidence was "strong," U.S. Br. 12, "runs headlong into the inescapable conclusion that the particular jury that heard the evidence apparently did regard the case as close." *Id*.

Fourth, the prosecution's improper remarks were "deliberately placed before the jury to divert attention to extraneous matters." *Scheetz*, 293 F.3d at 186. They were the culmination of the rebuttal closing argument, diverted the jury's attention to the defendant's failure to present evidence and to his supposed "equal access" to have evidence tested without proof that he had such access, and were meant to be the "last thing" for the jury to consider before its deliberations. JA 444.

Fifth, as discussed above, the prosecution's burden-shifting argument was not "invited by improper conduct of defense counsel." *Scheetz*, 293 F.3d at 186. Defense counsel questioned the government's failure to have the DNA swab tested and suggested, consistent with the government's own evidence, that a DNA test would not have been "useful." JA 436. This argument suggested, at most, that the government failed to present sufficient evidence to show Texidore guilty beyond a reasonable doubt. Defense counsel never suggested that failing to test for DNA

was due to any governmental misconduct and did not even suggest that a test would have provided exculpatory evidence. Defense counsel's argument was completely proper, and the government does not contend otherwise in its brief. U.S. Br. 21-22. The prosecutor's emphatic and repeated argument that Texidore could have had the evidence tested and was "afraid to find" what the test results would show was not in response to any improper conduct by defense counsel.

Finally, no "curative instructions were given to the jury." *Scheetz*, 293 F.3d at 186. In fact, the district court overruled Texidore's objections to the government's argument and refused to give a curative instruction, even after defense counsel requested one. JA 450. The court's general instructions to the jury *before* argument that the defendant is innocent until proven guilty and that the government must prove each essential element of the crime beyond a reasonable doubt could have done nothing to mitigate improper closing argument when the court never informed the jury that the argument was improper in the first place.

In sum, the prosecution's improper closing remarks "prejudicially affected [Texidore's] substantial rights so as to deprive [him] of a fair trial." *United States v. Mitchell*, 1 F.3d 235, 242 (4th Cir. 1993) (internal quotations omitted). Texidore's conviction should be reversed.

22

## **CONCLUSION**

For the reasons stated above and in his opening brief, appellant Roberto Texidore respectfully requests that this Court vacate his conviction and remand for further proceedings.

This, the 25th day of June, 2012.

Henderson Hill, Executive Director
Federal Defenders of
Western North Carolina, Inc.

/s/ Ann L. Hester
Ann L. Hester
Assistant Federal Defender
129 W. Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720

ATTORNEY FOR APPELLANT ROBERTO TEXIDORE

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

this brief contains <u>5,433</u> words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportional spaced typeface using
<u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

/s/  Ann L. Hester
Ann L. Hester
Attorney for Appellant

Dated:  June 25, 2012

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on June 25, 2012, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System, which will send notice of such

filing to the following registered CM/ECF users:

Amy E. Ray
OFFICE OF THE U.S. ATTORNEY
United States Courthouse
100 Otis Street
Room 233
Asheville, NC 28801
amy.ray@usdoj.gov

*Counsel for Appellee*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/  Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219